**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

HALLMARK SPECIALTY INSURANCE COMPANY,

Plaintiff,

v.

CASE NO.: ____________________

FRATTLE STAIRS & RAILS, INC., a Florida corporation, and THE POINTE CONDOMINIUM OWNERS' ASSOCIATION, INC., a Florida not-for-profit corporation,

Defendants.
_________________________________/

# COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, Hallmark Specialty Insurance Company ("Hallmark"), files its Complaint for Declaratory Judgment against Defendants Frattle Stairs & Rails, Inc. ("Frattle") and The Pointe Condominium Owners' Association, Inc. (the "Association"), and alleges:

## NATURE OF ACTION

Hallmark seeks declarations that neither of the two excess liability policies it issued to its insured, Frattle, obligates Hallmark to indemnify Frattle for any portion of a $5,025,000.00 consent final judgment entered pursuant to a stipulation between Frattle and the Association in a construction defect lawsuit in Walton County,

Florida. The Consent Judgment was not the product of a trial. Frattle and the Association agreed to its terms, including a finding that Frattle's work damaged other property at The Pointe Condominium and a period-by-period allocation of that damage reaching back to December 2014. Yet, the plain terms of the Hallmark policies dictate that Hallmark's excess coverage: (1) attaches only above the limits of the scheduled underlying insurance, (2) applies only to damage that takes place during Hallmark's policy periods, (3) is capped by stated limits, and (4) excludes property damage within the products-completed operations hazard that arises out of, or is related to, a condominium project. Each of these provisions independently relieves Hallmark of any obligation to indemnify Frattle for the consent judgment.

Separately, Hallmark has no obligation to indemnify Frattle for any amount set forth in the Consent Judgment because Frattle violated conditions of the Hallmark Excess Policies. Specifically, the Hallmark policies expressly prohibit any insured, such as Frattle, from making or authorizing an admission of liability or attempting to settle or otherwise dispose of a claim or suit without Hallmark's written consent. Yet, that is precisely what occurred here. Frattle admitted liability and Frattle settled the Underlying Lawsuit without informing Hallmark, much less obtaining Hallmark's consent. Accordingly, Hallmark has no duty to indemnify Frattle for the consent judgment.

Strictly in the alternative, if any portion of the Consent Judgment is determined to be covered by and enforceable against Hallmark, Hallmark seeks a declaration that no more than $360,550.01 of the Consent Judgment is attributable to a period during which a Hallmark Excess Policy was in effect, subject to all other terms, conditions, limitations, and exclusions of the Hallmark Excess Policies.

## JURISDICTION AND VENUE

1. This is an action for declaratory relief per 28 U.S.C. § 2201.

2. For the reasons set forth in this section and below, this Court possesses jurisdiction over this matter under 28 U.S.C. § 1332(a)(1) because the citizenships of the parties are diverse and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. The consent final judgment at issue is in the amount of $5,025,000.00, and each Hallmark policy at issue carries a $5,000,000 each-occurrence limit of insurance.

3. Venue is proper in the United States District Court for the Northern District of Florida pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) because all Defendants are residents of Florida, the Association resides in this District, and a substantial part of the events giving rise to this action occurred in this District. The condominium property at issue is located in Walton County, Florida, and the Underlying Lawsuit and consent final judgment arose in the Circuit Court of the

First Judicial Circuit in and for Walton County, Florida, which is located in this District and in the Pensacola Division thereof.

4. All conditions precedent to the filing of this action have occurred or have been complied with.

5. A case or controversy exists between the parties, such that an action for declaratory judgment is ripe and appropriate under the requirements of 28 U.S.C. § 2201 and Article III, Section 2 of the United States Constitution.

**PARTIES**

6. At all times material to this action, Hallmark is and was an Oklahoma corporation with its principal place of business in Dallas, Texas. Accordingly, Hallmark is and was a citizen of Oklahoma and Texas for purposes of diversity jurisdiction. Hallmark issued the policies at issue as a surplus lines insurer per Florida Surplus Lines Law.

7. At all times material to this action, Frattle is and was a Florida profit corporation with its principal place of business in Jacksonville, Florida. Accordingly, Frattle is and was a citizen of Florida. Frattle is not a citizen of Oklahoma or Texas. A true and correct copy of Frattle's annual report filed with the Florida Secretary of State is attached hereto as **Exhibit 1**.

8. At all times material to this action, the Association is and was a Florida not-for-profit corporation and the condominium association for The Pointe

Condominium, organized and existing pursuant to Chapter 718, Florida Statutes. The Association's principal place of business is in Walton County, Florida. Accordingly, the Association is and was a citizen of Florida. The Association is not a citizen of Oklahoma or Texas. A true and correct copy of the Association's annual report filed with the Florida Secretary of State is attached hereto as **Exhibit 2**.

9. The Association is a party to this action because it holds a judgment against Frattle, Hallmark's named insured, and claims, or may claim, an interest in the proceeds of the Hallmark policies at issue.

10. The Association is therefore an interested party whose rights will be affected by the declarations Hallmark seeks, and it should be bound by them.

## FACTUAL ALLEGATIONS

The Policies

11. Hallmark issued two excess policies to named insured Frattle.

12. The first excess policy (policy number 77HX21973F) provided coverage in the amount of $5 million per occurrence and in the aggregate for the March 23, 2021 to March 23, 2022 policy period (the "First Hallmark Excess Policy"). A redacted copy of the First Hallmark Excess Policy is attached as **Exhibit 3**.

13. The second excess policy (policy number 77HX229941) provided coverage in the amount of $5 million per occurrence and in the aggregate for the March 23, 2022 to March 23, 2023 policy period (the "Second Hallmark Excess

Policy”).[1] A redacted copy of the Second Hallmark Excess Policy is attached as **Exhibit 4**.

14. Each Hallmark Excess Policy was excess over primary insurance issued by Colony Insurance Company (“Colony”).

15. Colony issued a primary insurance policy to Frattle for the March 23, 2021 to March 23, 2022 policy period (policy number 600 GL 0017266-04), which provided limits of $1 million per occurrence, $2 million in the general aggregate, and $2 million in the products-completed-operations aggregate (the “First Colony Primary Policy”).

16. Colony issued a second primary insurance policy to Frattle for the March 23, 2022 to March 23, 2023 policy period (policy number 600 GL 0017266-05), which provided limits of $1 million per occurrence, $2 million in the general aggregate, and $2 million in the products-completed-operations aggregate (the “Second Colony Primary Policy”).[2]

17. The Association filed a lawsuit in the Circuit Court of the First Judicial Circuit in and for Walton County, Florida, captioned *The Pointe Condominium Owners’ Association, Inc. v. Atticus Highway 98 Venture, LLC, et al.*, Case No.

[1] For ease of reference, the First Hallmark Excess Policy and the Second Hallmark Excess Policy are collectively referred to as the “Hallmark Excess Policies.”
[2] For ease of reference, the First Colony Primary Policy and the Second Colony Primary Policy are collectively referred to as the “Colony Primary Policies.”

2024-CA-000300 (the "Underlying Lawsuit"). A true and correct copy of the initial complaint is attached hereto as **Exhibit 5**.

18. The Association's amended complaint in the Underlying Lawsuit, dated December 30, 2024 (the "Underlying Complaint"), asserts claims against dozens of defendants, including developers, contractors, design professionals, inspectors, and subcontractors, arising out of the design and construction of The Pointe Condominium (the "Property"). A true and correct copy of the Underlying Complaint is attached as **Exhibit 6**.

19. The Underlying Complaint names Frattle as one of a group of defendants it collectively calls the "Subcontractors," and it asserts three counts against the Subcontractors: Count 39 for violation of building code, Count 40 for negligence, and Count 41 for breach of statutory warranties [Ex. 6 ¶¶ 668-692].

20. In Count 39, the Association alleges that the Subcontractors violated the Florida Building Code "by improper construction and installation of their respective scopes of work," and that those violations "caused, and will continue to cause, damage to the Subject Property" and "have damaged and will continue to damage other property, and the work of other trades" [Ex. 6 ¶¶ 672-673]. The Association brings Count 39 under section 553.84, Florida Statutes [Ex. 6 ¶ 669].

21. In Count 40, the Association alleges that the Subcontractors owed a duty "to use reasonable care when constructing the Subject Property," that they

breached that duty, and that their negligence "has caused, and will continue to cause, damage to the Subject Property" and "other property, and the work of other trades" [Ex. 6 ¶¶ 681-682, 684].

22. In Count 41, the Association alleges that the Subcontractors were required to warrant all improvements pursuant to section 718.203, Florida Statutes, that they breached those warranties, and that "[t]he aggregate effect of the defects and deficiencies . . . has led to community-wide damage and water intrusion, loss of use, damages to the Subject Property . . . and damage to the work of other trades" [Ex. 6 ¶¶ 688-690].

23. In each count, the Association seeks damages in excess of $50,000.00, including the cost of repairing the construction deficiencies, the resulting damages from those deficiencies, and incidental and consequential damages, among other relief [Ex. 6 ¶¶ 676, 686, 691].

The Consent Final Judgment

24. Frattle and the Association filed in the Underlying Lawsuit a Stipulation and Joint Motion for the Entry of a Consent Final Judgment. A true and correct copy of the Consent Judgment is attached as **Exhibit 7**.

25. On July 28, 2026, the state court entered a "Consent Final Judgment Against Frattle Stairs and Rails, Inc." (the "Consent Judgment"), which was filed on July 29, 2026.

26. The Consent Judgment states that "[t]his matter involves the Pointe Condominium community, located in Walton County, FL (the 'Property')" [Ex. 7 ¶ 3].

27. The Consent Judgment further states that the Association "is the Condominium association for the Property, organized and existing pursuant to Chapter 718, Florida Statutes, to provide for the maintenance and operation of the Property" [Ex. 7 ¶ 4].

28. According to the Consent Judgment, Frattle "was hired by CONSTRUCTION TWO, LLC and was responsible for fabricating elevator beams, and fabricating and installing stairway stingers [sic], and stairwell, balcony and breezeway railings at the Property ('Scope of Work')" [Ex. 7 ¶ 5] (all caps in original).

29. The Consent Judgment states that Frattle "was negligent in its performance of its Scope of Work," and that "[t]he construction and installation of the balcony and breezeway railings on all three buildings was defective and not compliant with industry standards and the Florida Building Code, violating Section 553.84, Fla. Stat." [Ex. 7 ¶ 7].

30. The Consent Judgment also states that "FRATTLE's negligence and building code violations resulted in physical damage to other property, including the

other building components not installed by FRATTLE, such as the structural wood framing and wood sheathing at the Property" [Ex. 7 ¶ 8].

31. The Consent Judgment finds that the Association "was damaged in the amount of $5,025,000.00, representing the total cost to repair the resulting damage to other property at the Property from FRATTLE's negligence and building code violations," and it allocates that amount among the following periods [Ex. 7 ¶ 9]:

(a) $25,000 "attributed to damages that occured [sic] between 12/03/2014 [sic] and 1/17/2014";

(b) $279,000.00 "attributed to damages that occured [sic] between 1/17/2016 and 1/17/2017";

(c) $1,360,449.99 "attributed to damages that occurred between 3/23/2017 and 3/23/2020";

(d) $3,000,000.00 "attributed to damages that occured [sic] between 3/23/2020 and 3/23/2021"; and

(e) $360,550.01 "attributed to damages that occurred between 3/23/2021 and 3/23/2022."

32. The Consent Judgment repeats the same allocation in its findings and adjudges that the Association "shall take $5,025,000.00 in final judgment against Defendant FRATTLE STAIRS AND RAILS, INC., which shall bear post-judgment

interest at the statutory rate per annum, pursuant to S55.03 [sic], Fla. Stat., until the judgment is paid" [Ex. 7 at 4-5].

33. Notably, the Consent Judgment does not attribute any portion of the $5,025,000.00 to damage that occurred after March 23, 2022.

34. By its own terms, the Consent Judgment attributes $4,664,449.99 of the $5,025,000.00 to damage occurring before March 23, 2021, and attributes its earliest damages to a period in 2014 [Ex. 7 ¶ 9].

35. The state court reserved jurisdiction "to enforce collection of and compliance with the terms of the settlement agreement between the parties, Final Judgment, and the Stipulation and Joint Motion for the Entry of a Consent Final Judgment" [Ex. 7 at 5].

36. Hallmark was not a party to the Underlying Lawsuit, to the Stipulation and Joint Motion for the Entry of a Consent Final Judgment, or to the settlement agreement referenced in the Consent Judgment. The Consent Judgment was entered on the stipulation of Frattle and the Association, not after a trial on the merits.

37. Hallmark did not defend Frattle in the Underlying Lawsuit.

38. Upon information and belief, the Association asserted claims against Colony in a separate action for declaratory relief, and in July 2026 the Association and Colony resolved those claims by settlement and Colony was dismissed with prejudice.

39. The Schedule of Underlying Insurance in the First Hallmark Excess Policy lists Colony Policy No. 600 GL 0017266-04 for the term March 23, 2021 to March 23, 2022 as the underlying commercial general liability insurance [Ex. 3, Schedule of Underlying Insurance].

40. The Schedule of Underlying Insurance in the Second Hallmark Excess Policy lists Colony Policy No. 600 GL 0017266-05 for the term March 23, 2022 to March 23, 2023 as the underlying commercial general liability insurance [Ex. 4, Schedule of Underlying Insurance].

41. Each Hallmark Excess Policy is written on Excess Liability Policy form HX 00 02 01 09, which contains the following insuring agreement:

> SECTION I
>
> INSURING AGREEMENTS
>
> A. COVERAGE
>
> This insurance only applies to injury or damage covered by the UNDERLYING INSURANCE, and that takes place during OUR policy period. WE will pay on YOUR behalf the ULTIMATE NET LOSS in excess of the applicable limits of the UNDERLYING INSURANCE listed in the attached Schedule of UNDERLYING INSURANCE (whether such insurance is collectible or not). If the UNDERLYING INSURANCE does not pay a loss for reasons other than the exhaustion of an aggregate limit of insurance, then WE shall not pay such loss.
>
> The Definitions, Terms, Conditions, Limitations, and Exclusions of the UNDERLYING INSURANCE, in effect at the inception date of this policy, apply to this coverage unless they are inconsistent with provisions of this policy, or relate to premium, subrogation, any

> obligation to defend, the payment of expenses, limits of insurance, cancellation or any renewal agreement.

[Ex. 3, Form HX 00 02 01 09, § I.A; Ex. 4, Form HX 00 02 01 09, § I.A].

42. Each Hallmark Excess Policy contains the following limits of insurance provision:

> B. LIMITS OF INSURANCE
>
> The Limit of Insurance stated in the Declarations as applicable to "each OCCURRENCE" shall be the total limit of OUR liability for all covered damages sustained as the result of any one OCCURRENCE.
>
> The Limit of Insurance stated in the Declarations as "aggregate" shall be the total limit of OUR liability for all covered damages sustained during each annual period of this policy; and for which any UNDERLYING INSURANCE provides coverage that is subject to an aggregate limit. . . .

[Ex. 3, Form HX 00 02 01 09, § I.B; Ex. 4, Form HX 00 02 01 09, § I.B].

43. Each Hallmark Policy contains the following defense and supplemental payments provisions:

> C. DEFENSE PROVISIONS AND SUPPLEMENTAL PAYMENTS
>
> 1. DEFENSE PROVISIONS
>
> When insurance is available to the INSURED in any UNDERLYING INSURANCE, WE shall not be called upon to assume charge of the investigation, settlement or defense of any SUIT brought against the INSURED, but WE shall have the right and be given the opportunity to be associated in the defense and trial of any SUITS relative to any OCCURRENCE which, in OUR opinion, may

> create liability on the part of US under the terms of this policy.
>
> We will assume charge of the settlement or defense of any SUIT brought against the INSURED to which this policy applies and to which no UNDERLYING INSURANCE applies because of the exhaustion of aggregate limits of insurance.
>
> . . .
>
> 2. SUPPLEMENTAL PAYMENTS
>
> WE will pay the following with respect to any claim or SUIT WE defend:
>
> . . .
>
> f. all interest on that part of any judgement which accrues after entry of the judgement and before WE have paid, offered to pay, or deposited in court that part of the judgement which does not exceed the limit of liability of this policy.

[Ex. 3, Form HX 00 02 01 09, § I.C; Ex. 4, Form HX 00 02 01 09, § I.C].

44. Section III of each Hallmark Policy contains the following definitions:

> F. ULTIMATE NET LOSS means the amount paid or payable in cash in the settlement or satisfaction of claims for which the INSURED is liable, either by adjudication or compromise with OUR written consent, after making proper deduction for all recoveries and salvages.
>
> . . .
>
> G. UNDERLYING INSURANCE means the policy or policies of insurance as described in the Declarations and Schedule of Underlying Insurance forming a part of this policy.

[Ex. 3, Form HX 00 02 01 09, § III; Ex. 4, Form HX 00 02 01 09, § III].

45. Each Hallmark Policy includes a Continuous and Progressive Damages Endorsement, form HX 00 22 01 09, which states:

> Section III, Definition C, Occurrence, is amended to read as follows:
>
> C. Occurrence means an accident including continuous or repeated exposure to substantially the same general harmful conditions.
>
> In the event of continuous, progressive, or deteriorating damage or injury which exists over any length of time, such damage or injury shall be deemed to be one Occurrence and shall be deemed to occur only at the time when such damage or injury first commences.

[Ex. 3, Form HX 00 22 01 09; Ex. 4, Form HX 00 22 01 09].

46. Each Hallmark Policy also includes form HB 00 20 01 09, which is listed in the Schedule of Forms and Endorsements as the "Residential Construction Limitation Endorsement" and is titled "Residential Construction Exclusion Endorsement" (the "Residential Construction Exclusion"). It states, in pertinent part:

> This insurance does not apply to BODILY INJURY, PROPERTY DAMAGE, OR PERSONAL INJURY AND ADVERTISING INJURY included within the PRODUCTS-COMPLETED OPERATIONS HAZARD, including DEFENSE PROVISIONS AND SUPPLEMENTAL PAYMENTS, that arises out of, or is related to any:
>
> 1. PLANNED UNIT DEVELOPMENT;
>
> 2. RESIDENTIAL HOUSING;
>
> 3. CONDOMINIUM PROJECT;
>
> 4. TOWNHOUSE PROJECT; or

> 5. Any existing building structure(s), including any existing residential apartment(s) that is/are in the process of being or has/have been converted to CONDOMINIUM(S) or TOWNHOUSE(S) by any insured or any other person(s) or entity.
>
> However, this endorsement does not apply to any insured's operations or work involving non-structural repair work, home improvement, or remodeling work that occurs after a PLANNED UNIT DEVELOPMENT, RESIDENTIAL HOUSING, CONDOMINIUM PROJECT, or TOWNHOUSE PROJECT is certified for occupancy, unless the work performed is to repair or replace YOUR WORK that was completed prior to the certification of occupancy.
>
> The following definitions are added to the policy:
>
> . . .
>
> CONDOMINIUM PROJECT or CONDOMINIUM(S) is/are a residential development consisting of one or more individually owned units and the remainder of the project is owned in common by the owners of the individual units.

[Ex. 3, Form HB 00 20 01 09; Ex. 4, Form HB 00 20 01 09].

47. Under Section I.A of each Hallmark Excess Policy, terms such as PROPERTY DAMAGE, PRODUCTS-COMPLETED OPERATIONS HAZARD, and YOUR WORK, which appear in the Residential Construction Exclusion, take the meanings given to them in the UNDERLYING INSURANCE, including the applicable Colony Primary Policy, except where inconsistent with the Hallmark Excess Policies.

48. Additionally, as condition to coverage, both of the Hallmark Policies state:

**SECTION IV**
**CONDITIONS**
. . .

F. DUTIES IN THE EVENT OF OCCURRENCE, OFFENSE, CLAIM OR SUIT.

. . .

3. YOU and any other involved INSURED must:
. . .
c. Cooperate with US in the investigation, settlement or defense of the claim or SUIT;
. . .

4. No INSUREDS shall make or authorize an admission of liability or attempt to settle or otherwise dispose of any claim or SUIT without OUR written consent.

49. Frattle failed to obtain Hallmark's written consent before admitting liability in the Underlying Lawsuit, as evidenced by the Consent Judgment.

50. Additionally, Frattle failed to obtain Hallmark's written consent prior to attempting to settle the Underlying Lawsuit.

51. Finally, Frattle failed to obtain Hallmark's written consent prior to settling and otherwise disposing of the Underlying Lawsuit.

**COUNT I**
**DECLARATORY JUDGMENT – FIRST HALLMARK EXCESS POLICY (NO ULTIMATE NET LOSS IN EXCESS OF THE UNDERLYING INSURANCE)**

52. Hallmark incorporates paragraphs 1-51 as if fully stated herein.

53. Under the First Hallmark Excess Policy, Hallmark agreed to pay only "the ULTIMATE NET LOSS in excess of the applicable limits of the

UNDERLYING INSURANCE." The policy further provides that "[i]f the UNDERLYING INSURANCE does not pay a loss for reasons other than the exhaustion of an aggregate limit of insurance, then WE shall not pay such loss" [Ex. 3, Form HX 00 02 01 09, § I.A].

54. The Consent Judgment attributes $360,550.01 to damage that occurred between March 23, 2021 and March 23, 2022, the period of the First Hallmark Excess Policy [Ex. 7 ¶ 9].

55. The $360,550.01 attributed to the First Hallmark Excess Policy period is less than the $1,000,000 each-occurrence limit of the scheduled underlying insurance, Colony Policy No. 600 GL 0017266-04, as well as that policy's $2,000,000 general and products-completed-operations aggregate limits [Ex. 3, Schedule of Underlying Insurance].

56. Thus, even if the entire $360,550.01 were covered, that amount would remain within the limits of the scheduled UNDERLYING INSURANCE.

57. Nothing would remain "in excess of the applicable limits of the UNDERLYING INSURANCE" for Hallmark to pay.

58. Further, upon information and belief, the limits of Colony Policy No. 600 GL 0017266-04 have not been exhausted through payment of covered claims, and Colony has not paid the loss reflected in the Consent Judgment because of the exhaustion of an aggregate limit of insurance.

59. Consistent with that excess structure, the First Hallmark Excess Policy provides that, "[w]hen insurance is available to the INSURED in any UNDERLYING INSURANCE," Hallmark "shall not be called upon to assume charge of the investigation, settlement or defense of any SUIT brought against the INSURED" [Ex. 3, Form HX 00 02 01 09, § I.C.1].

60. Hallmark, therefore, has no obligation to indemnify Frattle under the First Hallmark Excess Policy for the Consent Judgment, or any portion thereof, because the Consent Judgment does not give rise to any ULTIMATE NET LOSS in excess of the applicable limits of the UNDERLYING INSURANCE scheduled in the First Hallmark Excess Policy.

61. An actual, present, and justiciable controversy exists between Hallmark and one or more of the Defendants regarding this issue that warrants the entry of declaratory judgment by this Court.

WHEREFORE, Hallmark requests that this Court enter judgment in its favor and against Frattle and the Association declaring that Hallmark has no duty to indemnify Frattle under the First Hallmark Excess Policy, Policy No. 77HX21973F, for the Consent Judgment or any portion of it because the Consent Judgment does not give rise to any ULTIMATE NET LOSS in excess of the applicable limits of the UNDERLYING INSURANCE, and grant Hallmark such other and further relief as the Court deems just and proper.

## COUNT II

## DECLARATORY JUDGMENT – FIRST HALLMARK EXCESS POLICY (NO COVERAGE FOR DAMAGE THAT DID NOT TAKE PLACE DURING THE POLICY PERIOD)

62. Hallmark incorporates paragraphs 1-51 as if fully stated herein.

63. The First Hallmark Excess Policy "only applies to injury or damage covered by the UNDERLYING INSURANCE, and that takes place during OUR policy period" [Ex. 3, Form HX 00 02 01 09, § I.A].

64. The policy period of the First Hallmark Excess Policy is March 23, 2021 to March 23, 2022 [Ex. 3, Declarations].

65. Under the Continuous and Progressive Damages Endorsement, "[i]n the event of continuous, progressive, or deteriorating damage or injury which exists over any length of time, such damage or injury shall be deemed to be one Occurrence and shall be deemed to occur only at the time when such damage or injury first commences" [Ex. 3, Form HX 00 22 01 09].

66. The allegations underlying the Consent Judgment describe continuing and progressive property damage. The Underlying Complaint alleges the construction deficiencies "have caused, and will continue to cause, damage to the Subject Property," including "community-wide damage and water intrusion" [Ex. 6 ¶¶ 673, 684, 690].

67. Consistent with those allegations, the Consent Judgment attributes the resulting damage to other property to a series of periods beginning in December 2014 and continuing through March 23, 2022 [Ex. 7 ¶ 9].

68. The earliest period to which the Consent Judgment attributes the resulting property damage begins in December 2014, more than six years before the First Hallmark Excess Policy incepted on March 23, 2021 [Ex. 7 ¶ 9].

69. Accordingly, to the extent the resulting property damage reflected in the Consent Judgment constitutes continuous, progressive, or deteriorating damage, the Continuous and Progressive Damages Endorsement deems that damage one Occurrence occurring only when the damage first commenced. Because the resulting property damage is alleged and allocated to periods beginning years before March 23, 2021, that Occurrence precedes the inception of the First Hallmark Excess Policy.

70. Even apart from the Continuous and Progressive Damages Endorsement, the First Hallmark Excess Policy does not apply to damage that did not take place between March 23, 2021 and March 23, 2022.

71. The Consent Judgment attributes $4,664,449.99 of the $5,025,000.00 judgment to damage that occurred before March 23, 2021 [Ex. 7 ¶ 9].

72. None of that amount is damage that took place during the policy period of the First Hallmark Excess Policy.

73. Alternatively, Hallmark has no obligation to indemnify Frattle under the First Hallmark Excess Policy for any portion of the Consent Judgment attributable to damage that took place outside the period March 23, 2021 to March 23, 2022, including the $4,664,449.99 the Consent Judgment attributes to damage that occurred before March 23, 2021.

74. An actual, present, and justiciable controversy exists between Hallmark and one or more of the Defendants regarding this issue that warrants the entry of declaratory judgment by this Court.

WHEREFORE, Hallmark requests that this Court enter judgment in its favor and against Frattle and the Association declaring that Hallmark has no duty to indemnify Frattle under the First Hallmark Excess Policy, Policy No. 77HX21973F, for the Consent Judgment because the damage at issue did not take place during the First Hallmark Excess Policy's policy period or, alternatively, that Hallmark has no duty to indemnify Frattle under the First Hallmark Excess Policy for any portion of the Consent Judgment attributable to damage that took place outside the period March 23, 2021 to March 23, 2022, and grant Hallmark such other and further relief as the Court deems just and proper.

## COUNT III

## DECLARATORY JUDGMENT – FIRST HALLMARK EXCESS POLICY (NO COVERAGE IN EXCESS OF THE LIMITS OF INSURANCE)

75. Hallmark incorporates paragraphs 1-51 as if fully stated herein.

76. The Declarations of the First Hallmark Excess Policy state limits of insurance of $5,000,000 each-occurrence and $5,000,000 aggregate [Ex. 3, Declarations].

77. The Limit of Insurance applicable to "each OCCURRENCE" is "the total limit of OUR liability for all covered damages sustained as the result of any one OCCURRENCE," and the aggregate Limit of Insurance is "the total limit of OUR liability for all covered damages sustained during each annual period of this policy" for coverage subject to an aggregate limit in the UNDERLYING INSURANCE [Ex. 3, Form HX 00 02 01 09, § I.B].

78. Under the Continuous and Progressive Damages Endorsement, continuous, progressive, or deteriorating damage that exists over any length of time "shall be deemed to be one Occurrence" [Ex. 3, Form HX 00 22 01 09].

79. The Consent Judgment attributes the resulting property damage to periods beginning in December 2014 and continuing through March 23, 2022 [Ex. 7 ¶ 9]. To the extent that damage is continuous, progressive, or deteriorating, it constitutes one Occurrence under the Continuous and Progressive Damages Endorsement.

80. The Consent Judgment is in the amount of $5,025,000.00, plus post-judgment interest at the statutory rate [Ex. 7 at 5]. The amount of the Consent Judgment therefore exceeds by $25,000 the First Hallmark Excess Policy's $5,000,000 each-occurrence and aggregate limits.

81. Further, the First Hallmark Excess Policy obligates Hallmark to pay post-judgment interest only “with respect to any claim or SUIT WE defend” [Ex. 3, Form HX 00 02 01 09, § I.C.2].

82. Because Hallmark did not defend Frattle in the Underlying Lawsuit, the First Hallmark Excess Policy's supplemental-payment provision does not obligate Hallmark to pay post-judgment interest on the Consent Judgment.

83. Hallmark maintains that no coverage exists under the First Hallmark Excess Policy for any portion of the Consent Judgment for the reasons alleged in Counts I, II, and IV.

84. Even if coverage otherwise existed, Hallmark's liability under the First Hallmark Excess Policy cannot exceed the policy's $5,000,000 each-occurrence and aggregate limits, which apply only in excess of the applicable limits of the UNDERLYING INSURANCE. Further, the policy's supplemental-payment provision does not obligate Hallmark to pay post-judgment interest on the Consent Judgment because Hallmark did not defend the Underlying Lawsuit.

85. An actual, present, and justiciable controversy exists between Hallmark and one or more of the Defendants regarding this issue that warrants the entry of declaratory judgment by this Court.

WHEREFORE, Hallmark requests that this Court enter judgment in its favor and against Frattle and the Association declaring that Hallmark has no duty to indemnify Frattle under the First Hallmark Excess Policy, Policy No. 77HX21973F, for any amount in excess of that policy's $5,000,000 each-occurrence and aggregate limits of insurance, which apply only in excess of the applicable limits of the UNDERLYING INSURANCE, or for any post-judgment interest on the Consent Judgment, and grant Hallmark such other and further relief as the Court deems just and proper.

**COUNT IV**

**DECLARATORY JUDGMENT – FIRST HALLMARK EXCESS POLICY (THE RESIDENTIAL CONSTRUCTION EXCLUSION BARS COVERAGE)**

86. Hallmark incorporates paragraphs 1-51 as if fully stated herein.

87. The Residential Construction Exclusion in the First Hallmark Excess Policy provides that the insurance "does not apply to BODILY INJURY, PROPERTY DAMAGE, OR PERSONAL INJURY AND ADVERTISING INJURY included within the PRODUCTS-COMPLETED OPERATIONS HAZARD, including DEFENSE PROVISIONS AND SUPPLEMENTAL

PAYMENTS, that arises out of, or is related to any . . . CONDOMINIUM PROJECT" [Ex. 3, Form HB 00 20 01 09].

88. A CONDOMINIUM PROJECT "is/are a residential development consisting of one or more individually owned units and the remainder of the project is owned in common by the owners of the individual units" [Ex. 3, Form HB 00 20 01 09].

89. The Property is a CONDOMINIUM PROJECT. The Consent Judgment describes the Property as "the Pointe Condominium community" and states that the Association is "the Condominium association for the Property, organized and existing pursuant to Chapter 718, Florida Statutes" [Ex. 7 ¶¶ 3-4].

90. Count 41 of the Underlying Complaint likewise seeks relief on behalf of "the Association and the unit owners of Subject Property" under section 718.203, Florida Statutes, the warranty statute of Florida's Condominium Act [Ex. 6 ¶ 688].

91. The damages reflected in the Consent Judgment are for "physical damage to other property, including the other building components not installed by FRATTLE, such as the structural wood framing and wood sheathing at the Property" [Ex. 7 ¶ 8].

92. Those damages are PROPERTY DAMAGE.

93. The PROPERTY DAMAGE alleged in the Underlying Complaint and reflected in the Consent Judgment falls within the PRODUCTS-COMPLETED

OPERATIONS HAZARD, as that term is defined in the UNDERLYING INSURANCE, because the alleged damage occurred at the Property, away from premises owned or rented by Frattle, and arose out of Frattle's work after that work had been completed.

94. The Underlying Complaint seeks, among other relief, the cost of repairing the alleged construction deficiencies and resulting damage to the completed Property [Ex. 6 ¶¶ 676, 686, 691], and the Consent Judgment attributes the resulting property damage to periods extending through March 23, 2022 [Ex. 7 ¶ 9].

95. The PROPERTY DAMAGE reflected in the Consent Judgment arises out of, and is related to, the CONDOMINIUM PROJECT.

96. The alleged PROPERTY DAMAGE occurred at the CONDOMINIUM PROJECT and resulted from Frattle's fabrication and installation of stairway stringers and stairwell, balcony, and breezeway railings at the Property [Ex. 7 ¶¶ 5, 7-8].

97. The exception to the Residential Construction Exclusion does not apply because it reaches only an insured's "non-structural repair work, home improvement, or remodeling work that occurs after a . . . CONDOMINIUM PROJECT . . . is certified for occupancy" [Ex. 3, Form HB 00 20 01 09]. Upon

information and belief, Frattle's Scope of Work was performed as part of the original construction of the Property and before the Property was certified for occupancy.

98. Neither the Underlying Complaint nor the Consent Judgment alleges that Frattle performed non-structural repair, home-improvement, or remodeling work after the Property was certified for occupancy.

99. The Residential Construction Exclusion therefore applies to relieve Hallmark of any obligation to indemnify Frattle under the First Hallmark Excess Policy for the Consent Judgment.

100. An actual, present, and justiciable controversy exists between Hallmark and one or more of the Defendants regarding this issue that warrants the entry of declaratory judgment by this Court.

WHEREFORE, Hallmark requests that this Court enter judgment in its favor and against Frattle and the Association declaring that the Residential Construction Exclusion in the First Hallmark Excess Policy, Policy No. 77HX21973F, bars coverage for the Consent Judgment and that Hallmark therefore has no duty to indemnify Frattle under the First Hallmark Excess Policy for the Consent Judgment, and grant Hallmark such other and further relief as the Court deems just and proper.

## COUNT V

## DECLARATORY JUDGMENT – SECOND HALLMARK EXCESS POLICY

## (NO ULTIMATE NET LOSS IN EXCESS OF THE UNDERLYING INSURANCE)

101. Hallmark incorporates paragraphs 1-51 as if fully stated herein.

102. Under the Second Hallmark Excess Policy, Hallmark agreed to pay only "the ULTIMATE NET LOSS in excess of the applicable limits of the UNDERLYING INSURANCE." The policy further provides that "[i]f the UNDERLYING INSURANCE does not pay a loss for reasons other than the exhaustion of an aggregate limit of insurance, then WE shall not pay such loss" [Ex. 4, Form HX 00 02 01 09, § I.A].

103. The UNDERLYING INSURANCE scheduled in the Second Hallmark Excess Policy is Colony Policy No. 600 GL 0017266-05, which has a $1,000,000 each-occurrence limit, a $2,000,000 general aggregate limit, and a $2,000,000 products-completed-operations aggregate limit [Ex. 4, Schedule of Underlying Insurance].

104. The Consent Judgment attributes every portion of the $5,025,000.00 judgment to damage occurring on or before March 23, 2022 and attributes no damages to the period March 23, 2022 through March 23, 2023, the policy period of the Second Hallmark Excess Policy [Ex. 7 ¶ 9].

105. Because the Consent Judgment attributes no damages to the Second Hallmark Excess Policy period, it identifies no loss during that period that could exceed the applicable limits of Colony Policy No. 600 GL 0017266-05 and reach the Second Hallmark excess layer.

106. Further, upon information and belief, the limits of Colony Policy No. 600 GL 0017266-05 have not been exhausted through payment of covered claims, and Colony has not paid the loss reflected in the Consent Judgment because of the exhaustion of an aggregate limit of insurance.

107. Accordingly, Hallmark has no obligation to indemnify Frattle under the Second Hallmark Excess Policy for the Consent Judgment, or any portion thereof, because the Consent Judgment does not give rise to any ULTIMATE NET LOSS in excess of the applicable limits of the UNDERLYING INSURANCE scheduled in the Second Hallmark Excess Policy.

108. An actual, present, and justiciable controversy exists between Hallmark and one or more of the Defendants regarding this issue that warrants the entry of declaratory judgment by this Court.

WHEREFORE, Hallmark requests that this Court enter judgment in its favor and against Frattle and the Association declaring that Hallmark has no duty to indemnify Frattle under the Second Hallmark Excess Policy, Policy No. 77HX229941, for the Consent Judgment or any portion of it because the Consent

Judgment does not give rise to any ULTIMATE NET LOSS in excess of the applicable limits of the UNDERLYING INSURANCE, and grant Hallmark such other and further relief as the Court deems just and proper.

## COUNT VI
## DECLARATORY JUDGMENT – SECOND HALLMARK EXCESS POLICY
## (NO COVERAGE FOR DAMAGE THAT DID NOT TAKE PLACE DURING THE POLICY PERIOD)

109. Hallmark incorporates paragraphs 1-51 as if fully stated herein.

110. The Second Hallmark Excess Policy "only applies to injury or damage covered by the UNDERLYING INSURANCE, and that takes place during OUR policy period" [Ex. 4, Form HX 00 02 01 09, § I.A].

111. The policy period of the Second Hallmark Excess Policy is March 23, 2022 to March 23, 2023 [Ex. 4, Declarations].

112. The Consent Judgment attributes every dollar of the $5,025,000.00 judgment to damage occurring on or before March 23, 2022 [Ex. 7 ¶ 9].

113. The Consent Judgment attributes no portion of the judgment to damage occurring during the March 23, 2022 through March 23, 2023 policy period of the Second Hallmark Excess Policy.

114. Further, under the Continuous and Progressive Damages Endorsement in the Second Hallmark Excess Policy, continuous, progressive, or deteriorating damage "shall be deemed to be one Occurrence and shall be deemed to occur only

at the time when such damage or injury first commences" [Ex. 4, Form HX 00 22 01 09].

115. The earliest period to which the Consent Judgment attributes resulting property damage begins in December 2014, more than seven years before the Second Hallmark Excess Policy incepted on March 23, 2022 [Ex. 7 ¶ 9]. Accordingly, to the extent the resulting property damage reflected in the Consent Judgment constitutes continuous, progressive, or deteriorating damage, the Continuous and Progressive Damages Endorsement deems that damage one Occurrence occurring only when the damage first commenced, before the inception of the Second Hallmark Excess Policy.

116. Thus, none of the damage reflected in the Consent Judgment is attributed to the policy period of the Second Hallmark Excess Policy, and the Second Hallmark Excess Policy does not apply to the Consent Judgment.

117. Accordingly, Hallmark has no obligation to indemnify Frattle under the Second Hallmark Excess Policy for the Consent Judgment or any portion thereof.

118. An actual, present, and justiciable controversy exists between Hallmark and one or more of the Defendants regarding this issue that warrants the entry of declaratory judgment by this Court.

WHEREFORE, Hallmark requests that this Court enter judgment in its favor and against Frattle and the Association declaring that Hallmark has no duty to

indemnify Frattle under the Second Hallmark Excess Policy, Policy No. 77HX229941, for the Consent Judgment or any portion of it because the damage at issue did not take place during the Second Hallmark Excess Policy's policy period, and grant Hallmark such other and further relief as the Court deems just and proper.

**COUNT VII**

**DECLARATORY JUDGMENT – SECOND HALLMARK EXCESS POLICY**

**(NO COVERAGE IN EXCESS OF THE LIMITS OF INSURANCE)**

119. Hallmark incorporates paragraphs 1-51 as if fully stated herein.

120. The Declarations of the Second Hallmark Excess Policy state limits of insurance of $5,000,000 each-occurrence and $5,000,000 aggregate [Ex. 4, Declarations].

121. The Limit of Insurance applicable to "each OCCURRENCE" is "the total limit of OUR liability for all covered damages sustained as the result of any one OCCURRENCE," and the aggregate Limit of Insurance is "the total limit of OUR liability for all covered damages sustained during each annual period of this policy" for coverage subject to an aggregate limit in the UNDERLYING INSURANCE [Ex. 4, Form HX 00 02 01 09, § I.B].

122. Under the Continuous and Progressive Damages Endorsement in the Second Hallmark Excess Policy, continuous, progressive, or deteriorating damage

that exists over any length of time "shall be deemed to be one Occurrence" [Ex. 4, Form HX 00 22 01 09].

123. Strictly in the alternative, if coverage is determined to exist under the Second Hallmark Excess Policy, the policy's Limits of Insurance independently cap Hallmark's potential liability.

124. The Consent Judgment is in the amount of $5,025,000.00, plus post-judgment interest at the statutory rate [Ex. 7 at 5].

125. The amount of the Consent Judgment therefore exceeds by $25,000 the Second Hallmark Excess Policy's $5,000,000 each-occurrence and aggregate limits.

126. Further, the Second Hallmark Excess Policy obligates Hallmark to pay post-judgment interest only "with respect to any claim or SUIT WE defend" [Ex. 4, Form HX 00 02 01 09, § I.C.2].

127. Hallmark did not defend Frattle in the Underlying Lawsuit.

128. Because Hallmark did not defend Frattle in the Underlying Lawsuit, the Second Hallmark Excess Policy's supplemental-payment provision does not obligate Hallmark to pay post-judgment interest on the Consent Judgment.

129. Hallmark maintains that no coverage exists under the Second Hallmark Excess Policy for any portion of the Consent Judgment for the reasons alleged in Counts V, VI, and VIII.

130. Even if coverage otherwise existed, Hallmark's liability under the Second Hallmark Excess Policy cannot exceed the policy's $5,000,000 each-occurrence and aggregate limits, which apply only in excess of the applicable limits of the UNDERLYING INSURANCE. Further, the policy's supplemental-payment provision does not obligate Hallmark to pay post-judgment interest on the Consent Judgment because Hallmark did not defend the Underlying Lawsuit.

131. An actual, present, and justiciable controversy exists between Hallmark and one or more of the Defendants regarding this issue that warrants the entry of declaratory judgment by this Court.

WHEREFORE, Hallmark requests that this Court enter judgment in its favor and against Frattle and the Association declaring that Hallmark has no duty to indemnify Frattle under the Second Hallmark Excess Policy, Policy No. 77HX229941, for any amount in excess of that policy's $5,000,000 each-occurrence and aggregate limits of insurance, which apply only in excess of the applicable limits of the UNDERLYING INSURANCE, or for any post-judgment interest on the Consent Judgment, and grant Hallmark such other and further relief as the Court deems just and proper.

## COUNT VIII

## DECLARATORY JUDGMENT – SECOND HALLMARK EXCESS POLICY

## (THE RESIDENTIAL CONSTRUCTION EXCLUSION BARS COVERAGE)

132. Hallmark incorporates paragraphs 1-51 as if fully stated herein.

133. The Second Hallmark Excess Policy contains the same Residential Construction Exclusion, which provides that the insurance "does not apply to BODILY INJURY, PROPERTY DAMAGE, OR PERSONAL INJURY AND ADVERTISING INJURY included within the PRODUCTS-COMPLETED OPERATIONS HAZARD, including DEFENSE PROVISIONS AND SUPPLEMENTAL PAYMENTS, that arises out of, or is related to any . . . CONDOMINIUM PROJECT" [Ex. 4, Form HB 00 20 01 09].

134. The Residential Construction Exclusion defines a CONDOMINIUM PROJECT as "a residential development consisting of one or more individually owned units and the remainder of the project is owned in common by the owners of the individual units" [Ex. 4, Form HB 00 20 01 09].

135. The Property is a CONDOMINIUM PROJECT. The Consent Judgment describes the Property as "the Pointe Condominium community" and states that the Association is "the Condominium association for the Property, organized and existing pursuant to Chapter 718, Florida Statutes" [Ex. 7 ¶¶ 3-4].

136. The damages reflected in the Consent Judgment are for physical damage to other property at the Property, including “structural wood framing and wood sheathing,” and are PROPERTY DAMAGE [Ex. 7 ¶ 8].

137. The PROPERTY DAMAGE alleged in the Underlying Complaint and reflected in the Consent Judgment falls within the PRODUCTS-COMPLETED OPERATIONS HAZARD, as that term is defined in the UNDERLYING INSURANCE, because the alleged damage occurred at the Property, away from premises owned or rented by Frattle, and arose out of Frattle's work after that work had been completed [Ex. 6 ¶¶ 676, 686, 691; Ex. 7 ¶ 9].

138. That PROPERTY DAMAGE arises out of, and is related to, the CONDOMINIUM PROJECT because it constitutes alleged physical damage to other property at the Property resulting from Frattle's fabrication and installation of stairway stringers and stairwell, balcony, and breezeway railings [Ex. 7 ¶¶ 5, 7-8].

139. The exception to the Residential Construction Exclusion applies only to an insured's “non-structural repair work, home improvement, or remodeling work that occurs after a . . . CONDOMINIUM PROJECT . . . is certified for occupancy” [Ex. 4, Form HB 00 20 01 09]. Upon information and belief, Frattle's Scope of Work was performed as part of the original construction of the Property and before the Property was certified for occupancy.

140. Neither the Underlying Complaint nor the Consent Judgment alleges that Frattle performed non-structural repair, home-improvement, or remodeling work after the Property was certified for occupancy.

141. As a result, the Residential Construction Exclusion applies to relieve Hallmark of any obligation to indemnify Frattle under the Second Hallmark Excess Policy for the Consent Judgment.

142. An actual, present, and justiciable controversy exists between Hallmark and one or more of the Defendants regarding this issue that warrants the entry of declaratory judgment by this Court.

WHEREFORE, Hallmark requests that this Court enter judgment in its favor and against Frattle and the Association declaring that the Residential Construction Exclusion in the Second Hallmark Excess Policy, Policy No. 77HX229941, bars coverage for the Consent Judgment and that Hallmark therefore has no duty to indemnify Frattle under the Second Hallmark Excess Policy for the Consent Judgment, and grant Hallmark such other and further relief as the Court deems just and proper.

## COUNT IX

## DECLARATORY JUDGMENT – NO COVERAGE UNDER EITHER POLICY

## (FRATTLE VIOLATED BOTH POLICIES' CONDITIONS)

143. Hallmark incorporates paragraphs 1-51 as if fully stated herein.

144. The Hallmark Excess Policies prohibit an INSURED from making or authorizing an admission of liability or attempting to settle or otherwise dispose of any claim or SUIT without Hallmark's written consent [Ex. 3, Form HX 00 02 01 09, § IV.F.4; Ex. 4, Form HX 00 02 01 09, § IV.F.4].

145. The Hallmark Excess Policies further define ULTIMATE NET LOSS to mean the amount paid or payable in cash in the settlement or satisfaction of claims for which the INSURED is liable, "either by adjudication or compromise with OUR written consent," after making proper deduction for all recoveries and salvages. [Ex. 3, Form HX 00 02 01 09, § III.F; Ex. 4, Form HX 00 02 01 09, § III.F].

146. Frattle admitted liability in the Underlying Lawsuit without obtaining Hallmark's written consent.

147. Frattle attempted to settle, and ultimately settled, the Underlying Lawsuit without obtaining Hallmark's written consent.

148. Frattle's violations of the terms and conditions of the Hallmark Excess Policies prejudiced Hallmark by preventing Hallmark from participating in the settlement negotiations, independently evaluating the proposed settlement before

Frattle agreed to it, and exercising its contractual rights with respect to the settlement of the Underlying Lawsuit.

149. Hallmark disputes the reasonableness and enforceability of the Consent Judgment and alleges that the circumstances surrounding its negotiation and entry, including Frattle's unauthorized admission of liability and settlement without Hallmark's participation or written consent, support a determination that the Consent Judgment was unreasonable, collusive, and not entered in good faith.

150. As a result of Frattle's failure to comply with the written-consent requirements of the Hallmark Excess Policies, Hallmark contends that it has no obligation to indemnify Frattle for the Consent Judgment and that the Consent Judgment is not enforceable against Hallmark.

151. An actual, present, and justiciable controversy exists between Hallmark and one or more of the Defendants regarding Hallmark's obligations under the Hallmark Excess Policies and the enforceability of the Consent Judgment, warranting entry of declaratory judgment by this Court.

WHEREFORE, Hallmark requests that this Court enter judgment in its favor and against Frattle and the Association declaring that Frattle violated the terms and conditions of both Hallmark Excess Policies by admitting liability and settling the Underlying Lawsuit without Hallmark's written consent, such that Hallmark has no obligation to indemnify Frattle under either Hallmark Excess Policy for the Consent

Judgment, and grant Hallmark such other and further relief as the Court deems just and proper.

## COUNT X
## DECLARATORY JUDGMENT – COVERAGE UNDER THE HALLMARK EXCESS POLICIES IS LIMITED
## (STRICTLY IN THE ALTERNATIVE)

152. Hallmark incorporates paragraphs 1-51 as if fully stated herein.

153. Strictly in the alternative, and only in the event that coverage is determined to exist under either of the Hallmark Excess Policies notwithstanding the grounds for no coverage alleged above, Hallmark seeks a declaration limiting its potential liability to the amount of the Consent Judgment attributable to damage occurring during the applicable Hallmark policy periods.

154. The Consent Judgment attributes $3,000,000.00 to damages occurring between March 23, 2020 and March 23, 2021 [Ex. 7 ¶ 9]. Neither Hallmark Excess Policy was in effect during that period.

155. The First Hallmark Excess Policy, Policy No. 77HX21973F, was in effect from March 23, 2021 through March 23, 2022 [Ex. 3, Declarations].

156. The Consent Judgment attributes $360,550.01 to damages occurring between March 23, 2021 and March 23, 2022, the policy period of the First Hallmark Excess Policy [Ex. 7 ¶ 9].

157. The Second Hallmark Excess Policy, Policy No. 77HX229941, was in effect from March 23, 2022 through March 23, 2023 [Ex. 4, Declarations].

158. The Consent Judgment attributes no portion of the $5,025,000.00 judgment to damages occurring during the March 23, 2022 through March 23, 2023 policy period of the Second Hallmark Excess Policy [Ex. 7 ¶ 9].

159. Therefore, if the Consent Judgment's period-by-period allocation is applied to determine the amount potentially attributable to the Hallmark Excess Policies, only $360,550.01 of the Consent Judgment is attributable to a period during which either Hallmark Excess Policy was in effect.

160. Hallmark maintains that it has no obligation to indemnify Frattle for that amount, or any portion of the Consent Judgment, for the reasons set forth in Counts I through IX. Strictly in the alternative, however, if coverage is determined to exist notwithstanding those grounds, Hallmark's potential liability based upon the Consent Judgment's temporal allocation cannot exceed $360,550.01.

161. An actual, present, and justiciable controversy exists between Hallmark and one or more of the Defendants regarding the amount, if any, potentially attributable to the Hallmark Excess Policies, warranting entry of declaratory judgment by this Court.

WHEREFORE, strictly in the alternative and only if coverage is determined to exist under either Hallmark Excess Policy, Hallmark requests that this Court enter

judgment in its favor and against Frattle and the Association declaring that, based upon the period-by-period allocation set forth in the Consent Judgment, no more than $360,550.01 of the Consent Judgment is attributable to a period during which a Hallmark Excess Policy was in effect, subject to all other terms, conditions, limitations, and exclusions of the Hallmark Excess Policies, and grant Hallmark such other and further relief as the Court deems just and proper.

Dated: November 19, 2026.

HINSHAW & CULBERTSON LLP

s/ Rory Eric Jurman
Rory Eric Jurman
Florida Bar No. 194646
e-mail: rjurman@hinshawlaw.com
Peter J. Lewis
Florida Bar No. 118316
E-mail: plewis@hinshawlaw.com
201 East Las Olas Boulevard
Suite 1450
Ft. Lauderdale, FL 33301
Telephone: 954-467-7900
Facsimile: 954-467-1024
Primary: rjurman@hinshawlaw.com
*Counsel for Plaintiff Hallmark Specialty Insurance Company*